UNITED STATES v. FRIEDLAENDER & Co., INC. (No. 4271)[1]

[1] C. A. D. 104

United States Court of Customs and Patent Appeals, February 26, 1940

*Webster J. Oliver*, Assistant Attorney General (*Daniel G. McGrath*, special attorney, of counsel), for the United States.

*James W. Bevans* for appellee.

[Oral argument December 5, 1939, by Mr. McGrath and Mr. Bevans]

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges

JACKSON, Judge, delivered the opinion of the court:

This is an appeal from a judgment of the United States Customs Court (Third Division), one judge dissenting, sustaining the protest of appellee against the action of the Collector of Customs of the port of New York in refusing to release from customs custody certain chinaware unless the articles were marked so as to show Germany was the country of origin thereof.

The collector held that the merchandise was not legally marked under section 304 of the Tariff Act of 1930, as amended by the Customs Administrative Act of 1938.

The material portion of the protest reads:

* * * Protest is hereby made, under Paragraph 514 of the Tariff Act of 1930, against your decision of the 13th instant, excluding from delivery one case (#1498/2) of merchandise imported by Friedlaender & Co., Inc. You state that it cannot be released because it was not properly marked.

It is our contention that the merchandise is of Czechoslovakian origin and is properly marked. It is our view that the origin of the merchandise is not changed in any way by the fact that before it could be shipped, Germany had obtained control over the Czechoslovakian territory, in which manufacture took place and

from which country it was exported to the United States. This merchandise was completely manufactured in Czechoslovakia on orders placed before German occupancy of the Sudeten territory.

The merchandise was entered on December 10, 1938, and its marking must be in accordance with the provisions of the said amended section 304 which, at the time of the entry was in effect. The pertinent parts of the said section read as follows:

(a) MARKING OF ARTICLES.—Except as hereinafter provided, every article of foreign origin (or its container, as provided in subsection (b) hereof) imported into the United States shall be marked in a conspicuous place as legibly, indelibly, and permanently as the nature of the article (or container) will permit in such manner as to indicate to an ultimate purchaser in the United States the English name of the country of origin of the article. The Secretary of the Treasury may by regulations—

(1) Determine the character of words and phrases or abbreviations thereof which shall be acceptable as indicating the country of origin and prescribe any reasonable method of marking, whether by printing, stenciling, stamping, branding, labeling, or by any other reasonable method, and a conspicuous place on the article (or container) where the marking shall appear;

(2) Require the addition of any other words or symbols which may be appropriate to prevent deception or mistake as to the origin of the article or as to the origin of any other article with which such imported article is usually combined subsequent to importation but before delivery to an ultimate purchaser; and

(3) Authorize the exception of any article from the requirements of marking if—

    \*        \*        \*        \*        \*        \*        \*

(c) ADDITIONAL DUTIES FOR FAILURE TO MARK.—If at the time of importation any article (or its container, as provided in subsection (b) hereof) is not marked in accordance with the requirements of this section, and if such article is not exported or destroyed or the article (or its container, as provided in subsection (b) hereof) marked after importation in accordance with the requirements of this section (such exportation, destruction, or marking to be accomplished under customs supervision prior to the liquidation of the entry covering the article, and to be allowed whether or not the article has remained in continuous customs custody), there shall be levied, collected, and paid upon such article a duty of 10 per centum ad valorem, which shall be deemed to have accrued at the time of importation, shall not be construed to be penal, and shall not be remitted wholly or in part nor shall payment thereof be avoidable for any cause. Such duty shall be levied, collected, and paid in addition to any other duty imposed by law and whether or not the article is exempt from the payment of ordinary customs duties. The compensation and expenses of customs officers and employees assigned to supervise the exportation, destruction, or marking to exempt articles from the application of the duty provided for in this subsection shall be reimbursed to the Government by the importer.

(d) DELIVERY WITHHELD UNTIL MARKED.—No imported article held in customs custody for inspection, examination, or appraisement shall be delivered until such article and every other article of the importation (or their containers), whether or not released from customs custody, shall have been marked in accordance with the requirements of this section or until the amount of duty estimated to be payable under subsection (c) of this section has been deposited. Nothing in this section shall be construed as excepting any article (or its container) from the particular requirements of marking provided for in any other provision of law.

The report of the collector discloses that his action was based upon instructions from the Commissioner of Customs received in a telegram dated November 9, 1938, and which is published as T. D. 49743, 74 Treas. Dec. 223, reading:

(T. D. 49743)

*Products of Sudeten areas under German occupation*

Instructions regarding customs treatment of products exported from Sudeten areas under German occupation

TREASURY DEPARTMENT,
OFFICE OF THE COMMISSIONER OF CUSTOMS,
*Washington, D. C., November 10, 1938.*

*To Collectors of Customs and Others Concerned:*

There is published below a copy of a telegram dispatched on November 9, 1938, to collectors of customs, which is self-explanatory.

State Department having today announced to Treasury Department a change of jurisdiction from Czechoslovak to German in those Sudeten areas now under German occupation, products of those areas exported from any country on or after November 10, 1938, shall be regarded as products of Germany for the purposes of the marking provisions of the Tariff Act of 1930, and for determining applicable rates of duty. Such areas are to be regarded as parts of Germany on and after November 10, 1938, for determining dates of exportation for customs purposes. Give importers all possible notice.

JAMES H. MOYLE,
*Commissioner of Customs.*

The suit was tried in the city of New York and presented to the court upon the following stipulation of facts:

1. That the merchandise forming the subject matter of this suit was shipped from the Sudeten territory after November 10, 1938.

2. That the merchandise consists of chinaware, which, at the time of exportation, was marked in a conspicuous place, as legibly, indelibly, and permanently as the nature of the article would permit, in the following manner, to wit, each article was marked with the name "Czechoslovakia."

3. That the chinaware forming the subject matter of this suit was supplied on orders from The Friedlaender Co., as indicated on the consular invoice, said orders being dated March 5, 1938, June 3, 1938, July 14, 1938, September 23, 1938.

4. That the said chinaware (included in the importation and covered by the aforesaid orders from the Friedlaender Co.) was completely manufactured in Czechoslovakia prior to November 10, 1938.

From the judgment sustaining the protest the Government has appealed.

The issue is whether or not the imported merchandise, which had been completely manufactured in Sudeten territory, then part of the Republic of Czechoslovakia, should be so marked before release from customs custody as to indicate Germany as the country of origin, which included the said territory at the time the merchandise was exported.

The majority opinion of the trial court succinctly sets out the contentions of the parties and the law which they urged in support thereof. The said opinion held, on the question as to whether the said instruction of the Commissioner of Customs was arbitrary because it directed the change in marking 7 days before it was published in the TREASURY DECISIONS, that, since it is not a customs regulation because it does not bear the approval of the Secretary of the Treasury, the ruling was not binding on the court and it was unnecessary to determine whether or not it is reasonable.

Appellee contended below, according to the majority opinion, that the said instruction was void under section 6 of the Customs Administrative Act of 1938, in that it did not give a notice of 30 days after said publication before the change in practice should take effect. The said section reads:

\* \* \* No administrative ruling resulting in the imposition of a higher rate of duty or charge than the Secretary of Treasury shall find to have been applicable to imported merchandise under an established and uniform practice shall be effective with respect to articles entered for consumption or withdrawn from warehouse for consumption prior to the expiration of thirty days after the date of publication in the weekly Treasury Decisions of notice of such ruling; but this provision shall not apply with respect to the imposition of antidumping duties.

On this question the court in the majority opinion stated:

\* \* \* the record contains nothing to show that there was an "established and uniform practice" and it does not appear that the ruling resulted in the "imposition of a higher rate of duty or charge," because the only question in this case is whether the importer should be compelled to re-mark his goods before they are released from customs custody. If they are re-marked, section 304 (c) of section 3 of the Customs Administrative Act of 1938 provides for no assessment of additional duty.

We agree that the said instruction or ruling is not binding upon the court and since the record discloses that there was nothing before the trial court except the said stipulation the conclusion on the second question was proper.

The court below correctly stated that:

The main question for decision is whether the chinaware was marked at the time of importation so as to indicate the country of origin thereof. \* \* \*

and after further stating that:

\* \* \* If it was, the collector erred in refusing to release the same to the importer upon the payment of regular duties thereon. The statute prescribes in plain language that every article of foreign origin imported into the United States shall be marked in such manner as to indicate to an ultimate purchaser the country of origin. The court has construed the words "country of origin" to mean the country in which imported merchandise was produced, citing *Closset & Devers* v. *United States*, \* \* \* [Abstract 37655, 73 Treas. Dec. 1112] and *Reichenbach & Co., Inc.* v. *United States*, \* \* \* [Abstract 39532, 1 Cust. Ct. 430]. It was held that the country from which the articles covered by those cases were

shipped was not the country of origin even though they had entered the commerce of the exporting country. Under the decisions cited, if the goods herein involved were produced and completed in Czechoslovakia, or in the Sudeten area of Czechoslovakia seized by Germany, before Germany took jurisdiction of that territory, we are of opinion that the marking with the word "Czechoslovakia" is the marking prescribed by the statute, even though the goods were shipped from Germany after the jurisdiction had changed, but, if the merchandise was completed in the Sudeten area after Germany obtained jurisdiction, they would have to be marked "Germany" to comply with the statute.

held as follows:

* * * Since the merchandise was completely manufactured in Czechoslovakia, we hold that the word "Czechoslovakia" marked thereon is all the marking that is required by section 304 of section 3 of the Customs Administrative Act of 1938. * * *

Appellant contends that section 304 of the said tariff act, as amended, should be interpreted as requiring imported merchandise to be so marked as. to indicate the current name of the country of its origin and that for tariff purposes the instant merchandise originated in Germany.

The facts in this case differentiate it from those of any case of which we know. It appears that this is a case of first impression, in that the question to be determined is the legal marking of imported merchandise wholly manufactured in a country which became an integral part of another country before exportation.

We do not think, under the circumstances here, that the majority opinion below arrives at a conclusion consonant with the intent of Congress as expressed in the marking statute amended as aforesaid. As we see it, Congress intended that the ultimate purchaser should be able to know by an inspection of the marking on imported goods the country of which the goods is the product. The evident purpose is to mark the goods so that at the time of purchase the ultimate purchaser may, by knowing where the goods were produced, be able to buy or refuse to buy them, if such marking should influence his will.

The contention of appellee that the goods are marked in conformity with the requirements of the statute is based principally upon article 528 (c) of the Customs Regulations as amended in T. D. 49658, 74 Treas. Dec. 43, 68, which reads:

The country of origin means the country of manufacture or production. Further work or material added to an article in another country must effect a substantial transformation in order to render such other country the "country of origin" within the meaning of this article.

In view of what we have said herein, we are of opinion that the said article does not refer to a state of facts such as is here present. The following interpretation placed upon it in the dissenting opinion seems to us to be entirely reasonable and proper:

\* \* \* It is true that article 528 (c) of the Customs Regulations of 1937, as amended by T. D. 49658, states that "The country of origin means the country of manufacture or production." It also stated that "Further work or material added to an article in another country must effect a substantial transformation in order to render such other country the 'country of origin' within the meaning of this article." When the entire paragraph is read it is clear that the statement contained in the first sentence was made in view of the decisions of this court and the Court of Customs and Patent Appeals relating to merchandise that had been manufactured in one country and transported to another country for further work or complete finishing, and that it had no reference to a change of jurisdiction of the place of manufacture, or production, or origin. \* \* \*

It cannot be contended that the involved merchandise when it left its place of manufacture was a Czechoslovakian product. Still at the time of importation it was marked with the name of a country that was in being and it did not originate within the boundaries of that country. To the ultimate purchaser the mark would indicate as a fact that which was not true. This purchaser might refuse to buy German goods but might be perfectly willing to purchase Czechoslovakian goods, and by reason of the mark would be deceived in buying as the product of one country the product of another which he did not want.

We feel that the majority of the trial court placed too narrow a construction upon the term "country of origin" and we adopt as proper the construction of the expression as contained in the dissenting opinion, reading:

The term "country of origin" as used in section 304, *supra*, as amended, should not, in my view, be so restricted as to limit the operation of the statute to the *situs* of the merchandise at the instant of its creation. Its origin, so far as it relates to American commerce, began when it started on its journey to the United States. At that moment the country of its origin was Germany. The jurisdiction of the Sudeten area changed from Czechoslovakia to Germany very suddenly and not, as usually happens, after long wars or conquests, so that their manufactures presumably continued uninterruptedly, first under one jurisdiction and then under another, and the marking statute should if possible be so construed as to give it the intended effect, that is, that foreign merchandise should always be marked in such a way that the ultimate purchaser would know whether he was buying German, Italian, Japanese, English, French, or any other country's goods.

The judgment appealed from is *reversed*.

DISSENTING OPINION

GARRETT, Presiding Judge: I am in harmony with what seems to me to be the well-reasoned decision of the majority of the trial court and have little to add to what was there expressed.

The situation here concededly is quite extraordinary. What amounted to practically an overnight change in *political jurisdiction* over a portion of a sovereign nation occurred, that portion having

passed under the military occupation of another country. The merchandise here at issue had been completely manufactured and indelibly marked before that change in jurisdiction took place. At the time of its *production*, which in this case certainly means the same thing as *origin*, Germany had no political jurisdiction over the area in which the production or origination took place. Such jurisdiction apparently had been recognized at the *time of exportation*, but the statute does not require a marking to indicate the country of *exportation*. The requirement is that it indicate the country of *origin*. Germany, it may be conceded, was in a political sense the country of exportation, but it was not in any sense the country of production or origin. Holding this view, I am unable to acquiesce in the statement of the majority of this court that "It cannot be contended that the involved merchandise when it left its place of manufacture was a Czechoslovakian product." It seems to me that it was just that. Certainly it was when it was completed and physically it was the same when it left its place of completion.

I can readily understand that the change in jurisdiction over the areas necessitated changes on the part of the customs officials of the United States with respect to certain administrative matters, as, for example, the rates of duty in many instances, and that such changes might have been legally imperative, but I am unable to agree that the change in marking here described was required by, or that it in fact conforms to, the statute.

Discussing the intent of Congress with respect to the marking statute, my colleagues of the majority say:

The evident purpose is to mark the goods so that at the time of purchase the ultimate purchaser may, by knowing where the goods were produced, be able to buy or refuse to buy them, if such marking should influence his will.

I have no quarrel with this rule (although I think the requirement also may have some practical aspects relating to purely administrative actions) but I cannot agree that my colleagues apply it fully here in the statement:

To the ultimate purchaser the mark [Czechoslovakia] would indicate as a fact that which was not true. This purchaser might refuse to buy German goods but might be perfectly willing to purchase Czechoslovakian goods, and by reason of the mark would be deceived in buying as the product of one country the product of another which he did not want.

In the first place I do not agree that the stated mark "would indicate as a fact that which was not true." Upon the contrary, it seems to me to indicate the truth.

In the second place the converse of the proposition that a purchaser might refuse to buy German goods should be considered. Some purchasers may wish to buy German chinaware, by which I mean chinaware of actual German origin, that is made by Germans

in Germany. Obviously, the required marking on the merchandise here involved would deceive such purchasers, and that deception would result from the administrative direction of the Government itself. It seems to me, therefore, that the argument that the action complained of carries out the intent of Congress with respect to enabling ultimate purchasers to know the country of origin falls.

## DISSENTING OPINION

BLAND, Judge: I think the trial court correctly decided the issue in holding that the imported chinaware, being indelibly marked with the term "Czechoslovakia" was a full compliance with the marking statute, under the circumstances stated.

I am in disagreement with the conclusion reached by the majority that the military occupation and taking over of part of Czechoslovakia by Germany from and after the 10th day of November 1938, changed the situation in the slightest respect. According to the stipulation, the chinaware was ordered in March, June, July and September 1938, and all of the goods were completely manufactured and marked prior to November 10, 1938. Obviously, they originated in Czechoslovakia, and the Treasury Department was correct in its ruling, T. D. 49658, 74 Treas. Dec. 43, 68, that "the country of origin means the country of manufacture or production." If the country of origin then meant the country where the goods were manufactured and produced, even though they were subsequently transformed in some respects in another country, surely in the instant case, where nothing was done to the goods at all, their origin must remain where produced.

The majority opinion states that the evident purpose is "to mark the goods so that at the time of purchase the ultimate purchaser may, by knowing where the goods were produced, be able to buy or refuse to buy them, if such marking should influence his will." I agree with this conclusion. If purchasers prefer Czechoslovakian products to German products they ought to know who produced them. On the contrary, if they prefer German production to production elsewhere the public ought to know it. These goods are not of German production. Some countries stand out among their competitors as being able to produce certain kinds of goods better than any other country. People have a prejudice in favor of goods so produced and they have a right to know where they are produced in order that they may exercise their will. Moreover, American purchasers have the right, regardless of the excellence of quality, to choose between producers irrespective of the motives that prompt the attitude. The instant goods were produced in a country where, presumably, excellent chinaware was made, and it is unfair to everyone concerned if the goods of the American importer, which were indelibly stamped "Czecho-

slovakia" should now be required to meet the test in American commerce brought about by the new marking

If the goods were marked as "permanently as the nature of the article could permit" as stated in the stipulation, presumably they were marked at the time of manufacture in such a way that the marking could not be easily obliterated. Any subsequent marking in customs custody would obviously result in two markings of the same goods leading to confusion which the statute, in my judgement, did not contemplate.

It must be remembered that the marking statute was designed to accomplish a definite purpose and regardless of what might be held with reference to the *country from which goods are exported* when considering other phases of the customs law, such as are involved in the countervailing duty, dumping and other administrative provisions, it seems to me that "the country of origin" in the marking statute must necessarily be the country where the goods were manufactured and marked. Clearly it would make no difference how many persons or countries became the owners of goods after their production and marking, as long as they were produced, manufactured and marked in Czechoslovakia. Mere military occupation or a change of sovereignty of the place of manufacture does not change the situation. The majority say "It cannot be contended that the involved merchandise when it left its place of manufacture was a Czechoslovakian product." This, I think, is an incorrect and misleading statement. The question is not controlled by a consideration of when the merchandise left its place of production. It is *where* it is produced because the statute implies that the marking shall be done *conspicuously* and permanently which could only be done in merchandise like that at bar at the time it was produced.

The judgment of the trial court should be affirmed.